[Crim. No. 13331. Fourth Dist., Div. One. Aug. 2, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN EDWARD TURNER, Defendant and Appellant.

662

664

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Jeffrey J. Stuetz, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, A. Wells Petersen and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, J.**—In a second trial,[1] a jury found John Edward Turner guilty of rape (Pen. Code, former § 261, subd. 3),[2] two counts of oral copulation (§ 288a, subd. (c)), robbery (§ 211) and kidnaping (§ 207). The jury also found Turner used a gun in committing each offense (§§ 12022.3, subd. (a), 12022.5). Before trial, outside the presence of the jury, Turner consented to his counsel's stipulation acknowledging an earlier felony conviction. The jury findings thus resulted in Turner's additional conviction of being an ex-felon in possession of a firearm (§ 12021).

■ Turner's appeal from the judgment vigorously challenges his convictions on numerous grounds. Our lengthy opinion is necessary because Turner presents a number of issues including claims relating to the sufficiency of the evidence and allegations of prosecutorial misconduct. Under such circumstances, we cannot merely limit our review to the evidence favorable to the People but are required to examine the entire record in the light most favorable to the judgment to properly evaluate whether there is substantial evidence, i.e., reasonable evidence of solid and credible value, to support each conviction. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738].)

We first explain reversal of Turner's conviction of being an ex-felon in possession of a firearm is required under *People* v. *Hall* (1980) 28 Cal.3d 143, 157, footnote 9 [167 Cal.Rptr. 844, 616 P.2d 826] because Turner did not personally, knowingly, and voluntarily waive his *Boykin-Tahl* rights when he agreed to his counsel's stipulation of a prior felony conviction. We then discuss and reject Turner's contention of insufficiency of the evidence to support his convictions. In proceeding to analyze his numerous arguments of instructional error, we conclude the court did not prejudicially err. However, we agree with Turner's assertion it may be necessary under certain circumstances to instruct the jury on being armed with a weapon under section 12022, subdivision (a) or section 12022.3, subdivision (a) when the defendant is charged with personal use of a weapon under section 12022.5 or section 12022.3, subdivision (b), but hold the failure to do so here was not error. We reject the balance of Turner's contentions relating to prosecutorial misconduct, sentencing error and the denial of his new trial motion. We therefore reverse the conviction of being an ex-felon in possession of a firearm and affirm the balance of the judgment.

---

[1] Turner's first jury trial ended in a mistrial on defense counsel's motion following the prosecutor's opening statement.

[2] All statutory references are to the Penal Code unless otherwise specified.

I

Turner raped Ms. B., an instructor at San Diego Educational Cultural Complex (ECC), on August 15, 1980. Ms. B. had gone to the Round Table Bar between 10 and 11 p.m. to meet a friend. During the evening, she left the club several times to use an outside public telephone to call her friend. During the hour to hour and one-half she waited, Ms. B. danced and had one and one-half drinks. When her friend failed to appear, she left.

As she opened the door to her car, Turner, brandishing a pistol, shoved her inside the car. Telling her he was a good shot, he walked around the front of the car, tucked the gun into the front of his pants, and entered on the passenger side of the vehicle. Ms. B. explained her car had automatic door locks and by unlocking one door she unlocked the others.

Inside the car, Turner placed the gun between the seats, and told Ms. B. she would not be harmed if she cooperated and ordered her to drive out of the parking lot. Turner told her his name was James, he was from Kentucky, where he was married and had two children, he was unemployed, and his astrological sign was either Cancer or Leo. After learning she worked at ECC, Turner asked if she knew someone named "Peaches." They then drove to a secluded spot by an apartment complex where Turner forced Ms. B. to remove her pants and to orally copulate him. He then orally copulated her and raped her.

In order to seek help, and thinking her brother and also her boyfriend would be at her house, Ms. B. suggested that it would be more comfortable if she and Turner were to go there. Turner agreed. He took four of Ms. B.'s gold chains and $40 from her wallet and said the chains and the money were "collateral" to be returned if there was no one at her house.

Turner forced Ms. B. to dress and to drive in the direction of the Round Table Bar, ordering her to pull over by a Fedco store. Instead of doing as she was told, Ms. B. accelerated into the Round Table parking lot, stopped, yelled "This man is holding a gun on me" at two women walking out of the bar, and jumped out of the car as Turner was pointing the gun at her. Turner then drove off as she went in the bar to report the rape.

Several witnesses saw Ms. B. enter the bar. James Davis, a San Diego Police Department reserve officer and the Round Table's bouncer, testified he had noticed Ms. B. earlier as she left several times to make phone calls, noting she did not always use the phone. When she returned 30-40 minutes later her hair was not messed up, she was relatively calm and was not crying. Davis had not heard any commotion outside or the noise of a car

taking off before Ms. B. walked into the bar. Davis' testimony Ms. B. was calm was corroborated by Khaleelah Saleen, a patron, who testified she heard no noise, yelling or a car taking off before Ms. B. walked in. Ms. B. appeared to be angry but was not crying, and her clothes were not in disarray. San Diego Police Department Officers Garcia and Draper arrived at the Round Table about 40 minutes later. They testified Ms. B. was upset and on the verge of crying. As the officers drove her around in an attempt to recreate the crimes, Ms. B. was crying hysterically. An examining physician testified there was no sperm and no indication of physical injury, trauma or that Ms. B. had engaged in sexual intercourse.

The next morning, Ms. B. spoke with her friend, Beverly Fennell, telling her someone had stolen her car. Although Ms. B. did not tell Fennell about the rape, she did say some bad things had happened. Fennell told her friend Brian Jackson Ms. B.'s car had been stolen. That night Jackson went to a gambling house in southeast San Diego with a friend he identified as Jimmy Ray. Jackson overheard a conversation about a car and a frightened woman. Jackson discussed purchasing parts of the car with a man he identified at trial as Turner. Jackson's trial identification of Turner was tentative but was corroborated by Officer Fragoso, who said Jackson positively identified Turner in a photographic lineup, and by Wagner, the trial court bailiff, who said Jackson told him he was sure Turner was the man he saw at the gambling house. Turner told him where the car was. About 1 a.m., Jackson drove to see it, noted the license plate number, and called Fennell. She in turn called Ms. B., who called the police. Ms. B., accompanied by Fennell, went to the lot where the car was impounded and identified the car as belonging to her. The car's license plate was gone. The officer who had impounded the car was unable to recall whether the license plate was missing when he first took possession of the vehicle.

Ms. B. selected Turner's photograph in a photographic lineup, identified him in a live lineup before he was arraigned, and positively identified him at trial as the man who raped her. She noticed his hairstyle, his clothing, and the gold chain with a horn he wore around his neck. Ms. B. did not, however, notice Turner's gold front tooth or his scar near his left eye.

Turner's alibi defense was buttressed by his claim that he was being framed by his former girl friend, Ramona Manning, also known as "Peaches." He said he was with his current girl friend, JoAnne Mitchell, on the nights of August 15 and 16. Mitchell corroborated Turner's testimony. Mitchell's parents also testified Turner was with them at various times those evenings but did not state he was with them at the time Ms. B. was raped or at the time Jackson said he saw Turner at the gambling house. Turner also impeached Ms. B.'s testimony through the testimony of an automobile

sales manager who explained the model car Ms. B. drove was not equipped with an automatic door unlocking mechanism which worked in the manner she had described.

Turner had recently arrived in San Diego when he met Peaches in March 1980. They were soon living together. According to Turner, Peaches was very possessive, wanted to get married, and after seeing him with another woman told him "If I can't have you, nobody can have you." Turner moved in with Mitchell in June. After a Las Vegas trip with Mitchell, Peaches told him she knew about the trip and said "I told you, you can't do anything here in San Diego that I don't know of."

Turner's theory thus focused on Peaches' vengeful desire to cause him trouble. In order to succeed, he had to demonstrate a link between Peaches and Ms. B. He also needed to explain Ms. B.'s motive in assisting Peaches.

The Peaches-Ms. B. link was indirect. Although they both worked at ECC, Ms. B. testified she did not know Peaches but had heard of the name. Peaches testified she had helped Ms. B. in her job interview at ECC. She said she knew Ms. B. but they were not social friends. Peaches also knew Ms. B.'s sister.

Turner demonstrated Peaches had a high profile at ECC. She was extremely active, participating on various student body boards and offices, acting as a peer counselor, and holding at least two jobs in addition to being a student. Further, her picture appeared in two local newspapers.

Turner also attempted to establish Jackson was a link between Peaches and Ms. B. In August 1980 Turner lived in the same apartment complex as did Jackson's mother. Although Jackson denied he lived there he admitted staying there on occasion. He testified he saw Turner there a few times.

Turner attempted to show Ms. B.'s motive in helping Peaches by first trying to prove Ms. B. had falsified her scholastic background in her job application. This, in conjunction with Peaches' visibility at ECC, allowed Peaches to blackmail Ms. B. into testifying against Turner.

Finally, Turner attempted to discredit the testimony of various witnesses. Jackson was impeached by both Turner and the prosecutor because his testimony wavered. Turner also hired investigators who confronted the witnesses and at times contradicted their testimony.

## II

 In order to prevent the jury from learning Turner had previously been convicted of a felony, defense counsel stipulated to Turner's status as

an ex-felon, a necessary element of the offense of section 12021, being an ex-felon in possession of a concealable firearm. *People* v. *Hall, supra,* 28 Cal.3d 143, held where the accused concedes the status element of a section 12021 charge, the record must disclose the defendant's personal, voluntary and intelligent waiver of his constitutional rights. (*Id.,* at p. 157, fn. 9; see also *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592 [119 Cal.Rptr. 302, 531 P.2d 1086]; *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], cert. den. *sub. nom., Tahl* v. *California* (1970) 398 U.S. 911 [26 L.Ed.2d 72, 90 S.Ct. 1708].) In the chambers conference during which counsel offered the stipulation, the only time Turner spoke was in response to his attorney's question whether he served any prison term for his prior felony conviction. Since the record does not contain the required litany, we must reverse Turner's conviction on this count.

### III

Turner's argument of insufficiency of the evidence to support the convictions is tied to the bizarre nature of the events. In a not so rhetorical fashion, he challenges us to reflect on the enormous odds that cumulatively flow from a series of facts starting with a rapist selecting as his victim a person who works at the same place as his former girl friend and continuing to the remarkable fortuity that the victim's car *sans* license plate is identified and located the same night by a boyfriend of the victim's girl friend when that person for the first time happens to be in a crap game at a certain house in San Diego. Turner asks us to ponder these odds and necessarily the weight of that evidence against the solid, credible and far more reasonable evidence established by his alibi defense.

Admittedly the case before us is unusual. However, typical of many disputes, the ultimate resolution turned on the respective credibility of the protagonists—Ms. B. versus Turner. Through our adversary system where competent counsel can present relevant evidence for and against each party, it is left to the trier of fact to decide which person is truthful and which side made the better argument. Here, the jury and later the judge in the new trial motion had the full opportunity over a span of days to consider and examine what parts of the testimony of the witnesses should be accepted and what parts should be rejected. In performing their respective functions, both the jury and judge were satisfied Ms. B. was credible and Turner was not. A single witness' uncorroborated testimony is sufficient to sustain a conviction unless the testimony is physically impossible or inherently improbable. (*People* v. *Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123].) Our responsibility to see justice done does not allow us to reweigh the evidence and to decide contrary to a jury because of the

statistical improbability of these specific events having occurred. There are times when truth is indeed stranger than fiction. We are satisfied there is nothing inherently improbable in the conduct supporting the convictions which necessitates our intrusion into the jury's factfinding function.

## IV

## A.

In wide ranging criticism of various aspects of the prosecutor's conduct, Turner asserts he was denied a fair trial. Wherever possible we attempt to summarize and avoid unnecessary exposition of the details on which Turner registers his specific complaints.

Turner's trial strategy included a frontal assault on Ms. B.'s credibility. Under both his alibi and frameup theories, Turner's success at trial was keyed to his being able to establish Ms. B.'s unreliability as a witness. In response to this defense approach, the prosecutor understandably reacted, and as we shall explain on occasion overreacted, by characterizing Ms. B. as "doubly the victim in this case" since she was forced to repeat her story to many strangers over a long period of time. He described Ms. B.'s ordeal as being even more painful because of Turner's defense counsel: "Then, if that's not enough, she is brought to the District Attorney's Office where she tells the Deputy District Attorney what happened, another stranger. *Then there is a preliminary hearing in front of a judge. Her attacker is there, an attorney for the attacker, and you can see what that's like being questioned by the attorney for your attacker. You've seen what that's like.* That's not the end of it. Then there is a trial later on in front of a jury and alternates, total strangers who are all looking at her as she testifies. She tells about things that she doesn't want to remember which she feels ashamed of for no fault of herself, but that's the way society is; that's the way the crime is. *Then she is attacked by a trained lawyer who's hired by the defendant.* If after all of that credibility is questioned on the most insignificant details in the world, allegations are made that she's lying, that she's cheating her employer, that she's improperly got the position of a professional position that she's got, she has to put up with all of that." (Italics supplied.)

The prosecutor also referred to the investigators Turner's counsel hired as Turner's "minions" and "companions" who had attempted to dissuade witnesses from testifying. This characterization of Turner's investigators fit into the portrayal of Ms. B. as the victim because the investigators were not pursuing their investigative role but merely harassing this crucial witness.

During Turner's cross-examination of Ms. B., the prosecutor repeatedly objected to questions asked by Turner's counsel. In one exchange at a benchside conference the prosecutor exclaimed: "This makes me sick. I've never seen such a thing, your Honor." On rebuttal the prosecutor continued to solicit Ms. B.'s responses to several questions notwithstanding the court's earlier rulings sustaining Turner's objections.

In asking the jury to ponder the validity of Turner's alibi defense the prosecutor argued ". . . there is nothing to stop a defendant from building a huge smoke screen and throwing out red herrings all over the place." In what Turner maintains was a rank appeal to emotionalism, the prosecutor also told the jury it had to: ". . . see through the nonsense, to see through the smoke screen. There has been plenty of name calling which is meaningless as it is unfair.

"Because unless you see through the nonsense and personal attacks, there is no hope for the victims of crimes because they're all alone out there. A victim of a crime is probably the most alone person in the world. There is no law enforcement in the streets. Police officers don't really enforce the law; they just bring criminals into court. Prosecutors don't really enforce the law; all we do is present the cases. Jurys [*sic*] enforce the law, and that, ladies and gentlemen, is your duty."

The prosecutor also called Turner a "con-man." Turner says the jury may have interpreted this as a comment on Turner's prior felony record. Although Turner did not object to every cited instance of misconduct, he argues he was placed in a catch 22 position—the more he objected, the more it appeared as if he were trying to mask the truth, but when he failed to object the prosecutor introduced improper and prejudicial evidence. Turner also says the court's admonitions when given were ineffectually weak.

### B.

■ We have no quarrel with the prosecutor's theory that it was necessary for him to buttress Ms. B.'s credibility by explaining the rigors through which she had to proceed, starting with the indignity of the offenses and continuing through the numerous judicial proceedings. A prosecutor may certainly sympathetically portray a crime victim as the victim. Nor can the prosecutor be faulted for his efforts to bolster Ms. B.'s credibility by arguing her telling the details of the crime several times to many strangers indicates she was motivated to testify truthfully. (See *People* v. *Wiley* (1976) 57 Cal.App.3d 149, 163 [129 Cal.Rptr. 13], disapproved on another ground in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 286-287 [148 Cal.Rptr. 890,

583 P.2d 748].) However, the prosecution overreacted when it included Turner's lawyer as an additional villain who was attacking the victim. In referring to Turner's attorney in the manner that he did, the prosecutor obviously was casting aspersions on both Turner's constitutional right to defend himself and his right to be represented by counsel. (See *People v. Perry* (1972) 7 Cal.3d 756, 789-790 [103 Cal.Rptr. 161, 499 P.2d 129], disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564]; *People v. Jenkins* (1974) 40 Cal.App.3d 1054, 1058 [115 Cal.Rptr. 622]; *People v. Talle* (1952) 111 Cal.App.2d 650, 674-677 [245 P.2d 633].) A criminal defense lawyer may properly attack a witness' credibility even though that witness is also the victim of the crime. The prosecutor, however, commits misconduct when, through careful use of words, he labels defense counsel as an additional attacker in a prosecution of a violent offense.

Notwithstanding this misconduct, however, the prosecutor's actions in this case are unlike those described in *People v. Talle, supra,* 111 Cal.App.2d 650. There, the focus was on the defendant's ostensibly guilty state of mind and the defendant's need to hire an adroit lawyer in order to escape punishment. Here, the prosecutor's argument was directed to the credibility of the victim. In the circumstances of this case, the prosecutor's misconduct does not fall within the purview of *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229]. (See also *People v. Schindler* (1980) 114 Cal.App.3d 178, 188 [170 Cal.Rptr. 461].)

■ The prosecutor also committed misconduct through his emotional appeal to the jurors that only they have the power to enforce the law. (See *People v. Mendoza* (1974) 37 Cal.App.3d 717, 727 [112 Cal.Rptr. 565]; *People v. Martinez* (1978) 82 Cal.App.3d 1, 17 [147 Cal.Rptr. 208]; but see *People v. Shaw* (1965) 237 Cal.App.2d 606, 625 [47 Cal.Rptr. 96], cert. den. *sub. nom., Shaw v. California* (1966) 384 U.S. 964 [16 L.Ed.2d 676, 86 S.Ct. 1594].) The unflattering statements describing the defense investigators as Turner's companions and minions do not, however, constitute misconduct. The jury knew the investigators worked for the defense. The inferences argued by the prosecutor were within the scope of permissible argument. (Cf. *People v. Bain, supra,* 5 Cal.3d at p. 847.)

■ This is not a case where the defendant's rights of confrontation and cross-examination were vitiated by the court's evidentiary rulings. The key witness was hardly immunized from cross-examination. (See *Davis v. Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 355, 94 S.Ct. 1105].) Defense counsel was allowed reasonable latitude in the questioning of all the witnesses. And even though the prosecutor may have erred in asking Ms.

B. improper questions on rebuttal (see *People* v. *Lambert* (1975) 52 Cal.App.3d 905, 909-910 [125 Cal.Rptr. 404]), Turner's objections were sustained. The instructions given to the jury included the admonition that a question is not evidence.

■ The jury could not reasonably have interpreted the prosecutor's reference to Turner as a con man as identifying Turner as a felon. "Con man" is part of our everyday parlance with the well-accepted, sometimes almost complimentary, meaning that the individual so labeled is a super salesman, unusually adroit and manipulative in getting his or her own way.

## C.

■ In a different context, Turner also says the prosecutor's actions in obtaining discovery of the tape recording of the defense investigators' interview of Brian Jackson constitutes reversible error.

■ As a general and all-pervasive principle, a court may not compel production of defense evidence in a criminal trial. (*People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534].) ■ Here, in cross-examining Jackson, defense counsel referred to Jackson's tape-recorded interview with the defense investigators. When defense counsel asked whether Jackson was seriously contending the investigators had threatened and intimidated him, suggesting a tape of the interview indicated otherwise, the prosecutor objected and asked to examine a copy of the transcript of the tape. Out of the presence of the jury defense counsel stated "I intend to cross-examine this man about it, and at some point I will bring an investigator with a tape with copies for all the jury of this conversation with this man. He's [Jackson] a baldfaced liar and I think everybody is going to see that he's talking through both sides of his mouth." Defense counsel also indicated he had no objection to the transcript being given to the prosecutor provided it occurred after cross-examination. Later, the court ruled in that fashion, allowing the prosecutor access to this transcript at the conclusion of defense counsel's cross-examination. Turner says the court's ruling resulted in prejudicial error because the prosecutor was able to rehabilitate Jackson by casting the defense investigators as unethical and then in closing argument describing his witnesses as being pressured by Turner's minions. Appellate counsel's retrospective description of the events is at odds with the perception of Turner's defense counsel. Accordingly, we view Turner's present contention as a delayed attempt to second-guess his lawyer's trial tactics. We decline to accept this invitation on a record where *Pope*[3] error is neither raised nor shown.

---

[3] *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].

## D.

 Turner further berates the prosecutor by claiming he was denied due process because the prosecutor knowingly used the perjured testimony of Brian Jackson. After Turner's conviction defense counsel discovered that Jimmy Ray was probably a fictitious person and, in any event, a fictitious name to hide the true identity of the person who had actually accompanied Jackson. (See *post,* at pp. 685, 686.)

A defendant is denied a fair trial when the prosecutor knowingly uses false testimony. However, the defendant must establish by a preponderance of the evidence both that the witness committed perjury and that the prosecutor knew it was perjury. (See *People* v. *Gordon* (1973) 10 Cal.3d 460, 473-474 [110 Cal.Rptr. 906, 516 P.2d 298]; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 384 [136 Cal.Rptr. 45].) Here, Jackson testified he went to the gambling house the night of August 16 with "Jimmy Ray," a high school acquaintance. Turner never located Ray. At Turner's new trial motion, the prosecutor commented upon Jackson's testimony regarding Ray, in effect admitting Jackson's testimony was not absolutely truthful. According to Turner we must now reverse because the prosecutor knew Jackson was committing perjury and failed to so advise the court.

Jackson's testimony at trial was shown to be at least partially untruthful. After looking through several high school yearbooks, he was unable to pick out Ray's picture. Ms. Reiser, the San Diego High School registrar, searched the school records and could not find anyone named Jimmy Ray. Although his testimony was not weightless, Jackson's lack of truthfulness on this issue was clearly established before the jury.

Even if we were to assume Jackson perjured himself when he said he went to the gambling house with someone named Jimmy Ray, Turner has failed to demonstrate the prosecutor knew of this. A prosecutor as a public lawyer has a weighty responsibility. We will not add to that burden by holding a defendant is invariably denied a fair trial when a prosecution witness commits perjury where the prosecution is unaware of the perjury. Turner was not denied a fair trial here where the prosecutor, unaware of possible perjury, allowed a witness later fully cross-examined and shown to be partially untruthful to testify.

## E.

 Turner also directs us to the prosecutor's decision to call the courtroom bailiff Brent Wagner as a prosecution witness after Jackson testified. During Jackson's direct examination, the prosecutor asked whether Jackson

had told the bailiff he was sure Turner was the same man at the crap game. Jackson answered he "thought so." Jackson also said he "didn't want to have anything to do with the case" and denied he was afraid Turner would have him killed. To show Jackson's answers were inconsistent with his earlier statements to the bailiff, Wagner testified without objection as follows: "He first approached me and asked me if Mr. Turner had made a statement to the fact that he was going to kill Mr. Jackson. I said, 'No, not to my knowledge.' And he said he was very afraid of Mr. Turner and that is why he was very hesitant about his testimony yesterday, and the fact that he wasn't sure if it was Mr. Turner at the crap game. I then just briefly asked if it was in fact Mr. Turner at the crap game, and he made the statement, 'Hell, yes, it is; I'm sure of it.' And so I asked, 'Well, why did you say that?' He said because he was very afraid of Mr. Turner and he was afraid Mr. Turner would have him killed or kill him himself."

There are no evidentiary impediments to this testimony. Turner, however, directs us to *Turner v. Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546] which held the defendant did not have a fair trial when the two deputy sheriffs who acted as the jurors' custodians during the trial also were key prosecution witnesses. Although that case involved a three day trial where the two deputies were in continuous and intimate association with the jurors (*id.*, at p. 473 [13 L.Ed.2d at p. 429]), its reasoning was extended to a nonsequestered jury in a one day trial where the bailiff never discussed the case with any juror. (*Gonzales v. Beto* (1972) 405 U.S. 1052 [31 L.Ed.2d 787, 92 S.Ct. 1503] (memorandum decision).) " '[I]t would be blinking reality not to recognize the extreme prejudice inherent in this association throughout the trial between the jurors and [this] key witness for the prosecution.' " (*Id.*, at p. 1056 [31 L.Ed.2d at p. 789], quoting *Turner v. Louisiana, supra*, 379 U.S. at p. 473 [13 L.Ed.2d at p. 429].) We must reverse if Turner has demonstrated to a reasonable probability he was prejudiced by Wagner's testifying. (See *Gordon v. Justice Court* (1974) 12 Cal.3d 323, 329 [115 Cal.Rptr. 632, 525 P.2d 72, 71 A.L.R.3d 551], cert. den. *sub. nom., California v. Gordon* (1975) 420 U.S. 938 [43 L.Ed.2d 415, 95 S.Ct. 1148].)

The bailiff in the case before us was not nearly as vital to the prosecution's case as were the bailiffs in *Turner* and *Gonzales*. Here, the reporter's transcript consists only of two pages where the testimony could not have taken more than three or four minutes. Also, in both *Turner* and *Gonzales* the prosecutor knew before the trial began the bailiffs would be key witnesses. Unlike those cases, the bailiff's involvement here was fortuitous, arising only during trial and after Jackson voluntarily spoke to Wagner. A court on its own motion must always be careful in assessing the potential prejudice when a bailiff is called to testify in the same proceeding he is functioning

as the bailiff. Where, however, the court is satisfied the probative value of the bailiff's proffered testimony exceeds its possible prejudice (see Evid. Code, § 352) the court should nonetheless use another bailiff whenever administratively possible in dealing with the jury thereafter. After weighing the testimony in this case, we hold that the error, if any, in permitting the bailiff to testify was harmless beyond a reasonable doubt.

### F.

**(13)** In evaluating the prosecutor's actions we are mindful that "'. . . prosecuting attorneys are government officials and [are] clothed with the dignity and prestige of their office. What they say to the jury is necessarily weighted with that prestige. It is their duty to see to it that those accused of crime are afforded a fair trial. . . . [The prosecutor] may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" (*People* v. *Talle, supra,* 111 Cal.App.2d at pp. 677-678 quoting from *Berger* v. *United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321, 55 S.Ct. 629].) Even when examined in this light, prosecutorial misconduct will not be grounds for reversal unless it is shown to be prejudicial. ▮ The reversal of a criminal judgment is not designed to punish prosecutors but rather to protect the fair trial rights of defendants. (*People* v. *Bolton* (1979) 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396].) After our examination of each of the errors and the cumulative impact of those errors in what we frankly acknowledge to be an atypical case, we conclude beyond a reasonable doubt that the errors complained of did not contribute to the verdict.

### V

Turner argues several instructional errors require reversal of specific counts and of the true findings of gun use.

### A.

Turner first complains about the robbery instructions, contending the jury was not instructed (1) that a temporary trespassory taking does not constitute robbery, (2) on larceny as a lesser included offense of robbery, (3) that the force or intimidation used must be motivated by an intent to steal and (4) with CALJIC No. 17.01. We discuss each separately.

▮ Regardless of a request for specific instructions, the trial court must act as a neutral arbiter between the contesting parties to guide the jury on

the law. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311].) ■ " " " "[I]n criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence the offense was less than that charged. [Citations.]' " (*Id.*, at pp. 323-324 quoting from *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another ground in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) Evidence on the lesser offenses, however, must reach a level sufficient to " 'deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable men could have concluded" ' " that the particular facts underlying the instruction did exist. (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 325, quoting from *People* v. *Flannel, supra,* 25 Cal.3d at p. 684.) Thus, a trial court need not instruct *sua sponte* on necessarily included offenses unless the evidence would justify a conviction of such offenses. (*Ibid.*)

■ In the case before us, robbery was defined for the jury and it was told that each of the requisite elements had to be proved beyond a reasonable doubt before Turner's guilt could be established. Those elements included "[t]hat the taking was accomplished either by force or violence or by fear or intimidation or by both and, [¶] . . . [t]hat such property was taken with the specific intent permanently to deprive such person of the property." Thus, if the jury was not satisfied Turner's taking of Ms. B.'s property was accompanied by the specific intent to permanently deprive her of that property it would have acquitted him. Finding against him on that issue on properly given instructions, any error in failing to give the instruction on trespassory taking was harmless.[4] (See *People* v. *Sedeno, supra,* 10 Cal.3d at p. 712.)

Moreover, in light of the conditions Turner imposed, we reject his premise that the taking of the property could have been "temporary." Turner conditioned the return of the jewelry and money upon Ms. B.'s taking him to her house where he could continue with his sexual assaults. He argues he lacked the specific intent to permanently deprive Ms. B. of her property.

---

[4]Turner also argues that even though he did not specifically ask for the lesser included offense of larceny, that request would have been useless since the court indicated it would not give any instructions on lesser included offenses of robbery. Because of the analysis above we would reach the same result even if Turner had specifically requested a larceny instruction.

Turner, however, intended to commit the robbery unless Ms. B. acted in a certain fashion. A victim's unwillingness to participate in criminal conduct should not benefit a defendant and result in a reduction of the crime committed by that defendant to a lesser offense. It would be irrational to hold that a victim must submit to further dangers and allow a defendant to commit other crimes in order to permit reduction of the degree of the defendant's criminal culpability.

■ In order to constitute a robbery ". . . the act of force or intimidation by which the taking is accomplished . . . must be motivated by the intent to steal in order to satisfy the requirement of section 20 [of the Penal Code]: if the larcenous purpose does not arise until after the force has been used against the victim, there is no 'joint operation of act and intent' necessary to constitute robbery." (*People* v. *Green, supra,* 27 Cal.3d at p. 54, fn. omitted.) For example, where the force used against the victim results in his death, the defendant's later intent to rob will not support a conviction of felony murder. (*Id.,* at p. 54, fn. 44.)

Turner's contention the court was required to instruct on the lesser included offense of larceny and to instruct *sua sponte* on the need for a direct union between the force or fear in Turner's taking of property from Ms. B. is tied to his perception that his taking could have been viewed as an act distinct from his earlier display of the gun which caused Ms. B. to fear for her life. In other words, Turner posits a conceptual scenario that a victim's fear and intimidation caused by the use of potential force may have sufficiently subsided at the time of the taking to require instructing the jury that the requisite force or fear cannot be established by reference to the force or fear used in the commission of the earlier criminal offense. The force or fear must be directly associated with the theft. Whatever intellectual value this argument may have, it does not apply to the facts of this case.

The jury found Ms. B. was intimidated by Turner's show of force. That force was ongoing, continuing through the time of Turner's later intent, if it was in fact formed after the kidnaping, to take the jewelry, money and car. There was no reason on these facts to give the lesser included instruction of larceny or to remind the jury the act of force or intimidation had to be motivated by the intent to steal.

■ Turner's last contention of instructional error pertaining to his robbery conviction is that the court permitted the jury to convict him without agreeing on a single specific act of robbery as the basis for the conviction. (See *People* v. *Diedrich* (1982) 31 Cal.3d 263, 280 [182 Cal.Rptr. 354, 643 P.2d 971]; *People* v. *Epps* (1981) 122 Cal.App.3d 691, 702-703 [176 Cal.Rptr. 332].) He argues the court had the *sua sponte* duty to give CAL-

JIC No. 17.01.[5] The obvious reasons for requiring jury unanimity on at least one particular crime do not require further discussion. (*People* v. *Diedrich, supra,* 31 Cal.3d at p. 281; see also *People* v. *Alva* (1979) 90 Cal.App.3d 418, 424-425 [153 Cal.Rptr. 644].)

■ An exception referred to as the "continuous conduct exception" has developed to the general rule requiring jury unanimity on the specific acts constituting a criminal offense. Included within that exception is the situation where two offenses are so closely connected in time that they in effect form part of one transaction. (See cases cited in *People* v. *Diedrich, supra,* 31 Cal.3d at p. 282.) ■ Robbery is not confined to a limited period since it continues until the perpetrator reaches a place of temporary safety and is in unchallenged possession of the stolen property. (See *People* v. *Salas* (1972) 7 Cal.3d 812, 820-824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], cert. den. *sub nom., Salas* v. *California* (1973) 410 U.S. 939 [35 L.Ed.2d 605, 93 S.Ct. 1401]; CALJIC No. 9.15.[6]) ■ Here, before the court gave CALJIC No. 9.15, the prosecutor without objection argued the taking of the money, gold chains and the car constituted a single robbery. Although Turner's driving off with the car occurred after the taking of the other items, it was part of one course of continuous conduct all occurring within a brief period of time against a single victim. Here, the multiple acts were just alternate ways of proving a necessary element of the same offense. (See *People* v. *Kent* (1981) 125 Cal.App.3d 207, 213 [178 Cal.Rptr. 28].)

Even accepting Turner's premise that the theft of the car could have been charged as a separate robbery offense (see *People* v. *Kent, supra,* 125 Cal.App.3d at p. 213), the court's error in failing to give CALJIC No. 17.01 on its own motion was harmless. Fundamental to this case was the jury's determination of the respective credibility of Turner and Ms. B. The jury rejected Turner's testimony he was not the rapist. It thus concluded Turner also stole her money and jewelry. Consequently, there is no reason-

---

[5]CALJIC No. 17.01 provides: "The defendant is charged with the offense of _____. He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

[6]CALJIC No. 9.15 provides: "The commission of the crime of robbery is not confined to a fixed place or a limited period of time.

"A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in hot flight, that is, while in possession of the stolen property he is fleeing in an attempt to escape. Likewise it is still in progress so long as he is still being immediately pursued in an attempt to capture him or regain the stolen property.

"A robbery is complete when the perpetrator has eluded his pursuers, if any; has reached a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property."

able probability of a different result had CALJIC No. 17.01 been given. (See *People* v. *McIntyre* (1981) 115 Cal.App.3d 899, 911 [176 Cal.Rptr. 3].)

## B.

Turner urges reversal of his kidnaping conviction because the court prejudicially erred in failing to instruct *sua sponte* on the essential element of general criminal intent and concurrence of act and intent. (See CALJIC No. 3.30 (1979 rev.).) The union of act and wrongful intent is required for every crime unless excluded expressly or by necessary implication. (*People* v. *Green, supra,* 27 Cal.3d at p. 53.) The crime of simple kidnaping is a general intent crime. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 745-763 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. *sub nom., Thornton* v. *California* (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], disapproved on other grounds in *People* v. *Flannel, supra,* 25 Cal.3d at p. 684, fn. 12.) Here, the jury was told the offenses of kidnaping to commit robbery and robbery were specific intent crimes and were instructed accordingly. The court also gave the appropriate instructions on general intent for the sex offenses and possession of a concealed firearm telling the jury it did not have to find the defendant had an intent to violate the law. General intent is present "[w]hen a person intentionally does that which the law declares to be a crime . . . even though he may not know that his act or conduct is unlawful." The general intent instruction was not given for the offense of kidnaping as a lesser included offense of kidnaping to commit robbery. The error in failing to give the necessary instruction is cured, however, where the factual question posed by the omitted instruction is resolved against the defendant under other properly given instructions. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 721.)

In instructing the jury on the elements of kidnaping, the jury was told that "[e]very person who unlawfully compels any other person, against her will and without her consent and because of a reasonable apprehension of harm, to move for a substantial distance, that is, a distance more than slight or trivial, is guilty of the crime of kidnapping." The court then proceeded to repeat the specific elements of kidnaping. In acquitting Turner of kidnaping to commit robbery and finding him guilty of simple kidnaping the jury decided he volitionally did that which the law declared to be a crime. There is no suggestion that Turner's conduct was the result of accident or mistake. His intent to do the acts constituting kidnaping was unified with his commission of those acts. Assuming arguendo the court's omission in failing to *sua sponte* instruct on general intent for kidnaping was error, there is no reasonable probability that a result more favorable to Turner would

have been reached. (See *People* v. *Gonzalez* (1978) 81 Cal.App.3d 274, 279 [146 Cal.Rptr. 417].)

## C.

■ Turner's remaining contentions of instructional error relate to the allegations of firearm use under sections 12022.3, subdivision (a) and 12022.5. He claims the court should have instructed *sua sponte* on being armed with a deadly weapon and firearm under section 12022.3, subdivision (b) and 12022, subdivision (a) because they are necessarily included within the allegations of his personally using a firearm under sections 12022.3 subdivision (a) and 12022.5.

As noted earlier, a trial court's responsibility to instruct *sua sponte* under *Wickersham-Flannel-Sedeno* principles is grounded on the notion "[t]he jury should not be constrained by the fact that the prosecution and defense have chosen to focus on certain theories. 'Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. [Citation.]' [Citation.] Furthermore, where counsel is not aware of alternative verdicts or incorrectly believes them to be irrelevant to the case, the trial court's action will avoid an unwarranted all-or-nothing choice for the jury and will ensure that the verdict is no harsher or no more lenient than the evidence merits. These policies reflect concern both for the rights of persons accused of crimes and for the overall administration of justice." (*People* v. *Wickersham, supra,* 32 Cal.3d at p. 324.)

Guided by these principles we address Turner's contentions. Fearful of treading on intellectually dangerous turf we are careful to avoid labeling an armed allegation as a "lesser included offense."[7]

---

[7]*People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520] recently held a "use" enhancement is not part of the accusatory pleading for the purpose of defining lesser included offenses. (*Id.,* at p. 96.) *People* v. *Boerner* (1981) 120 Cal.App.3d 506 [174 Cal.Rptr. 629] said that enhancements are not equivalent to offenses. (*Id.,* at p. 511.) However, in *People* v. *Superior Court* (*Mendella*) (1983) 33 Cal.3d 754 [191 Cal.Rptr. 1, 661 P.2d 1081] the court held a section 995 motion to set aside an indictment information could be used to challenge the sufficiency of the evidence to support an enhancement allegation as well as a substantive crime and thus for that purpose an enhancement allegation could be treated just like the other allegations of an accusatory pleading. (See *People* v. *Wolcott, supra,* 34 Cal.3d 92, Bird, C. J., dis. opn. at p. 110.) In *People* v. *Moringlane* (1982) 127 Cal.App.3d 811 [179 Cal.Rptr. 726] the broad statement in *Boerner* was thoughtfully criticized as being unnecessary to the holding and unsupported by the cited authorities. (*Id.,* at p. 818.)

Accepting the concept that weapon enhancements are not equivalent to criminal offenses for all purposes, there can be no doubt that every violation of section 12022.3, subdivision (a) or section 12022.5 involves a violation of section 12022.3, subdivision (b) or section 12022, subdivision (a). An enhancement of being armed with a firearm is necessarily included in a charging allegation of firearm use because the latter cannot be committed without committing the former. (See *People* v. *St. Martin* (1970) 1 Cal.3d 524, 536 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Marshall* (1957) 48 Cal.2d 394 [309 P.2d 456].) Although sections 12022, subdivision (a) and 12022.3, subdivision (b) may not be lesser included "offenses" under sections 12022.5 and 12022.3, subdivision (a), a defendant nonetheless commits those acts every time he commits the acts constituting violations of sections 12022.5 or 12022.3, subdivision (a). Section 12022.5 has been described as a limited application of section 12022 with a heavier penalty. (*People* v. *Strickland* (1974) 11 Cal.3d 946, 961 [114 Cal.Rptr. 632, 523 P.2d 672]; see also *People* v. *Provencher* (1973) 33 Cal.App.3d 546, 550 [108 Cal.Rptr. 792].) Thus, in those cases where a defendant is charged with a section 12022.5 or section 12022.3, subdivision (a) enhancement and the jury has evidence deserving of consideration which would support a finding that the defendant was only armed but did not use the weapon, the court must on its own motion instruct the jury on the elements of section 12022, subdivision (a) or section 12022.3, subdivision (b). To hold otherwise not only unfairly prejudices a defendant by giving the jury an all or nothing choice where the "all," psychologically easier for the jury, tilts in favor of the People but also results in the injustice described in *Wickersham.*

To say the instruction must be given in certain cases, i.e., those cases where there is sufficient evidence, is not the same as saying it was error not to so instruct here. A defendant is "armed" when he merely carries a weapon/firearm or has it available for use. (CALJIC No. 17.15 (1979 rev.); § 1203.06, subd. (b)(4).) A weapon/firearm is "used" when the defendant means to display it in a menacing manner or intentionally to strike at a human being with it. (CALJIC No. 17.16 (1977 rev.); CALJIC No. 17.19 (1977 rev.); § 1203.06, subd. (b)(3).) Consistent with these definitions which were given to the jury, there is no possibility Turner was simply armed with a gun but did not personally use it in the commission of all the offenses of which he was convicted.

The gun Turner used was an essential part of the crimes he committed. He first displayed it in the kidnaping and had it available for use thereafter. Although he placed the gun on the seat between himself and Ms. B., it was never out of his sight and always within his reach. When Ms. B. was forced to disrobe in preparation for the sexual assaults, Turner transferred the gun to a position on the floor where it was out of her way but still accessible to

him. The victim described the gun as "the most frightening thing to me because I just feared the gun more than anything." Where the victim is sufficiently frightened by the use of a weapon such that it becomes unnecessary to continually display the weapon during the course of later crimes against that victim within a brief span of time, a use finding under section 12022.5 is proper. (See *People* v. *Colligan* (1979) 91 Cal.App.3d 846, 851 [154 Cal.Rptr. 389].) It would indeed be paradoxical to hold otherwise and reward with reduced punishment the criminal who effectively uses a firearm. The court did not err in failing to instruct *sua sponte* on section 12022, subdivision (a) or section 12022.3, subdivision (b).

## VI

### A.

Turner's assertion the court prejudicially erred in denying his new trial motion on due process grounds because of the numerous instances of prosecutorial misconduct and erroneous court rulings has been fully answered and rejected in our earlier discussion of each of those specific contentions. Turner also claims the court applied the wrong standard in ruling on the new trial motion.

"A motion for a new trial is made to the sound discretion of the court, and its ruling will not be disturbed except on a showing of clear abuse. (*People* v. *McGarry* (1954) 42 Cal.2d 429, 432-433 [267 P.2d 254].)" (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843], cert. den. *sub nom., McDaniel* v. *California* (1976) 429 U.S. 847 [50 L.Ed.2d 119, 97 S.Ct. 131].) Where the motion for new trial is based on newly discovered evidence the defendant must show the evidence is in fact newly discovered; it is not merely cumulative to other evidence bearing on the factual evidence; that it must be such as to render a different result probable on a retrial; and that the moving party could not, with reasonable diligence, have discovered and produced the evidence at trial. (*Id.,* at p. 178.)

Here, in the course of investigating another case after Turner's conviction, defense counsel accidentally met one Jimmy Ray Cook who happened to be Brian Jackson's friend from high school. This person, however, had never been to a gambling house with Jackson. Defense counsel's new trial motion was grounded on the fact that Jimmy Ray Cook was a material defense witness who could establish that Jackson had deliberately falsified evidence.

Focusing solely on the element as to whether Jimmy Ray Cook's testimony would "render a different result probable on a retrial" we note the

trial court's evaluation of the evidence and comments at the new trial motion. In understandably stressing the significance of Ms. B. and Turner as the key witnesses during the trial the court said: "The jury had full opportunity to observe the testimony of both of these persons, and they did observe them, and I don't believe on the basis of the newly discovered evidence that you wish to present, that if that evidence was presented, that a different result would occur, or that it's probable a different result would occur on a retrial." The judge also commented that he was fully satisfied that Turner had a fair trial having been represented by "one of our finest criminal defense attorneys" and the jurors constituted a ". . . fair representation of the community . . . . And this jury had an opportunity to see these witnesses, and deliberated, and reached its conclusion. [¶] I feel our system of trial by jury . . . is entitled to respect for the way it deliberated on this case. And I don't find that the evidence is such that it would justify a trial." Our examination of the evidence in this light against the correct legal standard does not cause us to reach a different result. If Jimmy Ray Cook had testified at trial the only issue that would have clearly been established is that Jackson lied on the identity of the person with whom he had been gambling. This lie is consistent with Jackson's overall demeanor and testimony in which he quite obviously did not wish to implicate other persons in Turner's criminal trial. The fact that Jackson may have been gambling either by himself or with persons other than Jimmy Ray whom he was reluctant to name would have had at best only a minimal effect on those responsible to determine the facts. Turner was not denied his right to compulsory process by being unable to confront and cross-examine the "real" Jimmy Ray (Cook). A miscarriage of justice did not occur because Jimmy Ray Cook was not a witness at trial. In denying Turner's motion for new trial the court acted within its discretion.

### B.

Turner characterizes the prosecutor's willingness to permit a mistrial in Turner's first trial as having been intentionally provoked by him and contends his conduct results in Turner's second trial being barred on the ground of double jeopardy.

In *Oregon* v. *Kennedy* (1982) 456 U.S. 667 [72 L.Ed.2d 416, 102 S.Ct. 2083], the court held the double jeopardy clause bars a prosecution of a criminal defendant after he has successfully moved for mistrial in an earlier trial where the prosecutor's conduct was intended to provoke him into seeking the mistrial. (*Id.,* at p. 679 [72 L.Ed.2d at p. 427, 102 S.Ct. at p. 2091].) Turner says the prosecutor here purposefully withheld information about Jackson's testimony, thus causing Turner to move for the mistrial.

The case before us is a far cry from *Oregon* v. *Kennedy, supra*. Turner's motion occurred immediately after the prosecutor made his opening statement. The prosecutor could not have been attempting at that early stage to salvage a losing case. The effect of granting the mistrial motion here allowed defense counsel the opportunity to thoroughly interview Jackson. That interview, however futile Turner may now describe it, was of some benefit to the defense. The successful mistrial motion does not serve as a bar to Turner's later prosecution for the crimes he committed.

## VII

The judgment of conviction of being an ex-felon in possession of a firearm is reversed and the balance of the judgment is affirmed.

Cologne, Acting P. J., and Lewis, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 26, 1983. Bird, C. J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.