[No. H026476. Sixth Dist. June 8, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MONTY LOPEZ, Defendant and Appellant.

1512

COUNSEL

Danalynn Pritz, under appointment by Court of Appeal, the Law Offices of Pritz & Associates.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WALSH, J.**[*]— ■ Defendant Monty Lopez celebrated Easter Sunday in 2003 by having a few beers with family and friends in the yard of his San Jose duplex. His loud conversation disturbed his next-door neighbor, who called the police on him, as she had before. The officer who arrived first at about 8:40 p.m. thought he would be able to defuse the situation by talking to both people. Defendant reacted aggressively to the officer's presence, swearing, telling him to leave, and challenging him to fight. A friend restrained defendant. Other officers were called. Despite defendant's verbal and physical resistance, the officers were eventually able to handcuff him and take him into custody. This led to a jury convicting defendant of one felony, resisting or attempting to deter the performance of an executive officer's duties, and three misdemeanors, disturbing the peace, battering a peace officer, and resisting a peace officer.

Here we will determine, among other things, that defense counsel should have objected to evidence that each of the four defense witnesses had been arrested and that three of them had committed misdemeanor batteries and that defendant's invocation of his right to counsel, however colloquially phrased ("Fuck you. I want to talk to my lawyer"), should not have been construed as an adoptive admission. These errors require a reversal of the judgment.

### TRIAL EVIDENCE

#### *Maliciously disturbing another person by loud and unreasonable noise (count 1)*

According to Clara Senteno, she and defendant were initially friendly neighbors, but this deteriorated when defendant's "girlfriend" returned. Senteno had called the police on defendant several times before Easter Sunday, April 20, 2003.

---

[*]Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

On April 20, 2003, as Senteno was cleaning up her yard after a barbeque, she heard defendant through the fence separating their properties. He was outside, speaking loudly to friends, saying repeatedly, " 'Fucking niggers. Fuck them niggers. Come on, Chino. Let's go get 'em. Let's go blow their house up.' " Senteno's husband, Robert Harrison, is an African American. Harrison was away visiting a friend when defendant made these statements, though earlier that afternoon he had heard defendant talking loudly. Defendant had confronted Senteno with similar language before. On Easter Sunday, Senteno felt endangered and called the police.

Defendant did not testify at trial. The four defense witnesses—defendant's wife, Catherine;[1] his neighbor and friend, Ebrahen "Chino" Montoya; Chino's wife, Anna Vasquez; and Chino's son, Ibrahin—denied that defendant used any racial slurs and threatened anyone that day. Ibrahin testified that he, defendant, and his father were drinking beer that afternoon and talking loudly and cursing. They were talking about getting the people "on the other side." They did not mean the next-door neighbors, but the drug dealers behind their house. They were talking about dressing up like police and performing citizens' arrests. Catherine stated that defendant had enough to drink to make him a little drunk.

On cross-examination, Catherine admitted that she was arrested for forgery in 1998 and had been arrested by the police other times.[2] Chino admitted that he committed a battery in September 2001 and gave a false name to a police

---

[1] We use nicknames and first names of some witnesses for clarity and to avoid confusion over common last names and not out of disrespect.

[2] On direct examination, Catherine testified that Officer David Seminatore was scaring her on April 20, 2003, by the way he stared and did not respond to her questions. "Usually an officer would state why he's there and be really relaxed." She admitted the police had come to her house before.

On cross-examination, the prosecutor asked if Catherine remembered testifying about prior contact with the police. The following cross-examination ensued.

"Q: And is it fair to say that you don't like the police?

"A: No. It's not fair.

"Q: Is it fair to say that some of these times you've had contact with the police you've been arrested?

"A: No.

"Q: Well, you committed a forgery in 1998 right?

"A: Oh, my goodness. Yeah.

"Q. You were arrested on that, right?

"A. Yes.

"Q. Is that kind of hard for you to remember?

"A. Yes.

"Q. Okay.

"A. I tried to block it out.

"Q. Well, being arrested is, committing a crime I guess is something that people usually remember. Is that an unusual thing in your life?

"A. Yes.

"Q: Well, you've been arrested other times, right?

officer in January 2002. Anna Vasquez admitted an arrest for domestic violence in April 2003 and a conviction of a misdemeanor, the nature of which is unclear. Ibrahin admitted that he had been arrested about a month earlier. A year earlier he had committed an assault and battery in New Jersey. All these crimes were misdemeanors.

### Deterring or resisting the performance of an executive officer's duties by means of force or violence or threat thereof (count 2)

San Jose Police Officer David Seminatore responded to the disturbance call of threats between neighbors around 8:40 p.m. in uniform and in a marked patrol car. Having previously responded to several calls between these neighbors, he believed he could resolve it without another officer and without an arrest.

---

"A: I don't understand.

"Q: Well—

"A: How many other times do you mean being arrested is for?

"Q: I'm just asking you now. You say it's unusual for you to be arrested?

"A: Yes.

"Q: I just want to ask you about whether that's true or not. Do you remember being arrested January of this year for driving without a license, right?

"A: Driving without a license? I was arrested?

"MR. SPIELMANN: I will object as to relevance.

"THE WITNESS: Oh, my gosh.

"MR. SPIELMANN: May we approach?

"THE COURT: All right.

"(Whereupon, the attorneys approached the bench and a discussion was had off the record.)

"Q: (by Mr. Flattery) Ma'am, is it fair to say you have had several contacts with the police generally?

"A: Several.

"Q: And some of those have been when they arrested you, right?

"A: Yes.

"Q: And you're not really happy with the police about that, right?

"A: What I did in my past—

"THE COURT: Please answer the question.

"THE WITNESS: I'm okay with it. I did what I had to do.

"THE COURT: Please answer the question.

"THE WITNESS: What was the question?

"Q: (by Mr. Flattery) You are not—

"A: Not all—

"Q: —all these arrests in the past?

"A: No, that's not true.

"Q: And just so we're clear. One of those arrests was when you committed a forgery in 1998?

"A: Yeah. Okay.

"Q: I'm not gonna ask you about any more.

"A: Any more?"

Seminatore spoke briefly to Senteno to determine her complaint and to establish that she would not be a problem. Seminatore next sought to speak with defendant. Defendant was squatting with a young child in the yard behind a duplex. Defendant and his family lived in the front unit of the duplex. Chino and his family lived in the back unit. About six people were around defendant. Seminatore approached defendant by walking down the driveway of the neighboring duplex. Photographs that were in evidence showed that the driveways of the two duplexes are separated only by a small dirt strip.

According to Seminatore, as he approached defendant, defendant's wife asked why he was there. Defendant angrily shouted several times, "who the fuck is that?" Seminatore explained that there had been another complaint from their neighbor.

Defendant stood up and approached Seminatore, staggering as he walked. He appeared to be intoxicated, though able to care for himself. About five to eight feet from Seminatore, defendant leaned against a car in the driveway of his duplex. Seminatore explained that the neighbor had called. He asked if defendant had threatened her. Defendant replied, "I don't give a fuck" and "fuck them." Defendant removed a folding knife from his pants pocket and Seminatore took it from him.

According to defendant's wife and Chino's wife, Seminatore did not explain why he was there. Instead he just belittled defendant about being drunk and tried to provoke him by staring at him. According to Chino, Seminatore said that he was not there to arrest defendant, but he was responding to a neighbor's complaint that defendant was encouraging people to attack the neighbors.

Seminatore repeatedly tried to obtain defendant's reassurance that there would be no more problems if he left. Defendant swore and said he did not care about his neighbors complaining. He did not like them looking at the back of his house.

Chino and others told defendant to calm down. They reminded him he did not want to be arrested in front of his child.

After a few minutes of conversation, defendant repeatedly told Seminatore, "get the fuck out of here." As defendant was shouting, his friends were yelling for him to calm down. Defendant moved away from the car and faced Seminatore with clenched fists. Chino, a large man, stepped between them, grabbed defendant, and held him against the car. His son, Ibrahin, helped. Chino testified that he was holding defendant back against the car because the

officer was provoking him. Chino's wife heard defendant say, "This is a free country. Leave me alone," but not "get the fuck out of here." Chino heard defendant say get out of here without swearing.

Seminatore backed up and called on his radio for a fill unit. Defendant struggled to be released and said that Seminatore better call everyone. When he was momentarily released, he pulled his jacket off and said, "come on," which sounded to Seminatore like a challenge to fight. Chino again physically restrained defendant. Seminatore called for a "code three fill" emergency assistance.

As sirens approached, defendant became more agitated and said, " 'Come on, mother-fucker.' " Seminatore decided to arrest defendant for challenging him to fight and threatening him.

### Resisting or obstructing the discharge of a peace officer's duties (count 4)

A number of officers arrived in three patrol cars. Four officers walked up. Seminatore told them defendant had challenged him to fight and he needed help in taking defendant into custody. Chino complied with Seminatore's requests to release defendant and move away. San Jose Police Officer Gabriel Reyes told Officer Michael Bui to arrest and handcuff defendant.

Several officers told defendant he was under arrest. Defendant asked why they were "messing with" him. Officer Bui told defendant to turn around and put his hands behind his back. Defendant, who smelled of alcohol, did not comply. He resisted Bui's attempt to put his left arm in a twist lock. He squared up on Bui with clenched fists. Seminatore grabbed one of defendant's arms. Defendant said, "No, you don't." Other officers tried to get defendant's arms behind him.

Officer Reyes said they should take him down. Seminatore tried unsuccessfully to sweep defendant's legs out from under him. The force of several officers pushed defendant to his knees and then facedown on the ground. Officer Reyes struck defendant twice on his buttocks with his baton to deter him from kicking the officers. Defendant pushed himself up to his hands and knees. Officers Bui and Reyes told defendant to stop resisting. As defendant got up, an officer used pepper spray that hit defendant and Seminatore, who was right behind defendant. Seminatore jerked back and hit Reyes's head with the back of his head. Seminatore was blinded for about 20 minutes. Defendant continued to struggle and yell.

Other officers, including Beiderman, Johnson, and Bui, subdued defendant enough to handcuff him. They had to carry him 30 feet to a patrol car because defendant dragged his feet. Defendant kept swearing at the officers.

According to Chino, his wife and son, and defendant's wife, the other officers swarmed defendant, put him on the ground, and kneed his back and head without first speaking to Officer Seminatore and without defendant resisting, struggling, or using racial slurs.

### Using force or violence on a peace officer known to be performing his duties (count 3)

Officer Bui asked defendant to sit in the patrol car. Instead, defendant pushed off the door frame, turned around, and spit in Bui's face. Defendant said, "fuck you," or "take that, mother-fucker." Bui's eyes and lips smarted as though the spittle contained pepper spray. Defendant looked like he was getting ready to spit again. Officer Reyes tried to push defendant into the patrol car with his foot. Other officers had to take defendant to the ground again. Sergeant Pate told the officers to place defendant in a nylon wrap that secured his legs and arms. The police called an ambulance. It is police department policy to have a wrapped person examined at a hospital.

Defendant swore at the paramedics when they arrived. Defendant said to Officer Bui, " 'take these cuffs off or I'm gonna kill you.' " " 'I'm gonna kill your mom.' "

Defendant spit inside the ambulance at a paramedic, Nephty Landin, who then placed a mask on defendant. Defendant threatened to kill the paramedic when he was back on the street. Landin saw no injuries on defendant, though his face was red.

At the hospital defendant kept swearing and moving around. He tried to spit on Officer Bui again when his mask was removed. Defendant said he would remember Bui and would get him. Doctors examined defendant and cleared him to be jailed.

At the jail Bui read defendant his *Miranda* rights.[3] Defendant said he was drinking a beer and watching a friend put a motor in a car. When asked why he spit on Bui, defendant said that he had not. When asked why he resisted arrest, he said, " 'Fuck you. I want to talk to my lawyer.' "

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

Other trial testimony is set out where relevant below.

### The Verdict and Sentence

After deliberating for two hours on two days, the jury convicted defendant of the felony of resisting or attempting to deter the performance of an executive officer's duties (Pen. Code, § 69—count 2),[4] and three misdemeanors, disturbing the peace (§ 415—count 1), battering a peace officer (§§ 242, 243, subd. (b)—count 3), and resisting a peace officer (§ 148, subd. (a)(1)—count 4). In the jury's absence, defendant admitted a prior conviction of assault involving personal use of deadly weapon.

After denying defendant's motion to strike his prior strike conviction, the trial court sentenced defendant to prison for six years, doubling the upper term due to the prior strike and imposing concurrent 30-day terms for each of the misdemeanors. The court awarded attorney fees not to exceed $1,000.

### 1. Ineffective Assistance of Counsel

On appeal defendant contends that the jury heard a variety of inadmissible and prejudicial evidence because his trial counsel failed to object.

### A. *Impeachment by misdemeanor arrests and convictions*

Defendant claims that his trial counsel, a deputy public defender, should have objected when each defense witness was impeached by evidence that he and she had previously been convicted of or at least arrested for a misdemeanor.

To summarize, Chino admitted that he committed a battery in September 2001 and he gave a false name to a police officer in January 2002. His wife, Anna Vasquez, admitted an arrest for domestic violence in April 2003 and a conviction of a misdemeanor, the nature of which is unclear. His son, Ibrahin, admitted that he had been arrested about a month before the August 2003 trial. A year earlier he had committed an assault and battery in New Jersey. Defendant's wife, Catherine, admitted that she was arrested for forgery in 1998 and had been arrested other times. Defense counsel objected only once, to the relevance of defendant's wife being arrested for driving without a license.[5]

---

[4] Further unspecified section references are to the Penal Code.

[5] This objection was described earlier. (See fn. 2, *ante.*)

The jury was instructed that evidence of past misdemeanor conduct was relevant "only for the purpose of determining the believability of that witness. The fact that the witness engaged in past criminal conduct amounting to a misdemeanor, if it is established, does not necessarily destroy or impair a witness's believability." (CALJIC No. 2.23.1.) The jury was also instructed that the existence or nonexistence of a bias is relevant to a witness's believability. (CALJIC No. 2.20.)

The prosecutor asserted in opening argument that a witness's bias is relevant to assessing his or her credibility. "[E]ach defense witness has recently been arrested by San Jose Police Department. Probably not the same officers, but certainly the same agency. These people probably have an ax to grind against this agency. And you can assume that that's a reason that maybe they want to embellish, let's say, the testimony about the arrest."

The prosecutor argued further, without any defense objection, that the jurors already knew that "past criminal conduct" is also relevant to credibility. "If you're faced with the testimony of two people and you know one of them is a criminal and one of them is Mother Teresa, you're going to believe Mother Teresa over the criminal. It just makes sense. Okay? So something you can consider when deciding whether to trust someone is if they've had run-ins with the law before.

"And you'll remember the only contact prosecution witnesses have had with police is when they've had to call the police on this fellow disturbing the neighborhood. Right? But you'll remember that defense witnesses, each of them, have broken the law before. Catherine is a forger. Anna beat her husband after breaking things in the house. Ibrahin committed a battery in New Jersey. And Chino, the older fellow, lied to a police officer about his name when he was stopped, and he committed a battery last year.

"Now, they all have recent arrests, and they're all on probation.[6] And that's something that you should consider when asking yourself, 'Am I going to trust veteran, professional police officers, paramedics; or am I going to trust people that, well, you wouldn't trust with your property maybe?' "

In argument, defense counsel conceded that "[e]ach and every one of the civilian witnesses who testified on behalf of Mr. Lopez has a misdemeanor conviction," and that these convictions were relevant to their believability; but, he argued, as the instruction stated, misdemeanor conduct "does not

---

[6] Actually, Vasquez was awaiting sentencing at the time of trial, as the prosecutor's cross-examination had established. Her son, Ibrahin, admitted he was on probation.

necessarily destroy or impair their believability." "They came in here—convictions, warts, and all—and told you what they saw," even being inconsistent in the details.

■ Prior to the enactment of Proposition 8 in 1982, the Evidence Code precluded impeaching a person with specific acts of prior criminal conduct other than a felony conviction. (See Evid. Code, §§ 787–788.)[7] The enactment of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) invalidated this rule. *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938] has determined that a person can be impeached in a criminal case by evidence of prior misdemeanor *conduct* that involves moral turpitude. (*Id.* at pp. 295–297.) "Misconduct involving moral turpitude may suggest a willingness to lie." (*Id.* at p. 295.) However, evidence of a misdemeanor *conviction* remains "inadmissible hearsay when offered to impeach a witness's credibility." (*Id.* at p. 300, fn. omitted.)[8]

■ Forgery and giving a false name to an officer obviously involve a willingness to lie, and defendant does not suggest otherwise. Defendant argues that the prosecutor improperly impeached his witnesses with misdemeanor convictions and with misdemeanor conduct, such as assault and battery, that did not involve moral turpitude. It is true that simple battery is not a crime of moral turpitude. (*People v. Mansfield* (1988) 200 Cal.App.3d 82, 88–89 [245 Cal.Rptr. 800].) The evidence of batteries by Chino and his son was irrelevant to their credibility and was therefore objectionable.[9]

■ The Attorney General contends that it was proper to expose the biases of the defense witnesses. We recognize that, even if the commission of a battery does not prove the batterer has a disposition to lie, an arrest for battery might suggest a reason for the batterer to be biased against the arresting officers or agency. (Evid. Code, § 780, subd. (f); see *People v.*

---

[7] Evidence Code section 787 states: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

[8] Subsequently enacted Evidence Code section 452.5 creates an exception to this hearsay rule and allows prior misdemeanor conduct to be proved by official records of misdemeanor convictions. (Cf. *People v. Duran* (2002) 97 Cal.App.4th 1448, 1460 [119 Cal.Rptr.2d 272].) In this case, no such official records of the witnesses' misdemeanors were offered into evidence.

[9] We note the prosecutor did not mention in argument the one conviction of Anna Vasquez of an unspecified misdemeanor following her arrest for domestic violence. Misdemeanor sexual battery (*People v. Chavez* (2000) 84 Cal.App.4th 25, 30 [100 Cal.Rptr.2d 680]) and felony infliction of corporal injury on a spouse (*People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 [7 Cal.Rptr.2d 495]) are regarded as crimes of moral turpitude, but the record does not indicate the precise nature of this conviction.

*Anderson* (1978) 20 Cal.3d 647, 650 [143 Cal.Rptr. 883, 574 P.2d 1235].) But it is established that evidence of mere arrests is inadmissible because it is more prejudicial than probative. (*People v. Anderson, supra,* at pp. 650–651; cf. *People v. Medina* (1995) 11 Cal.4th 694, 769 [47 Cal.Rptr.2d 165, 906 P.2d 2].) "As we noted in *Grudt* [*v. City of Los Angeles* (1970) 2 Cal.3d 575 [86 Cal.Rptr. 465, 468 P.2d 825]], a witness'[s] credibility in the eyes of the jury would be seriously impaired by evidence of prior criminal arrests, because of the 'bad character' inevitably suggested thereby. (2 Cal.3d at p 592; [citations].)" (*People v. Anderson, supra,* 20 Cal.3d at p. 651.) Against this serious prejudice, it is a weak "thread of inferences from past arrests by the police, to hostility against police in general, to a willingness to distort testimony." (*Grudt v. City of Los Angeles, supra,* 2 Cal.3d at p. 592.)

Thus, none of the arrest evidence should have been admitted, due to the danger that it would be employed exactly as the prosecutor employed it—not simply to show that the witnesses might be biased against the police, but that each of them has an untrustworthy and criminal character.

■ To prevail on a claim of ineffective assistance, "First, a defendant must show his or her counsel's performance was 'deficient' because counsel's 'representation fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Second, he or she must then show prejudice flowing from counsel's act or omission. [Citations.] We will find prejudice when a defendant demonstrates a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.] 'Finally, it must also be shown that the [act or] omission was not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make.' [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 610–611 [123 Cal.Rptr.2d 345, 51 P.3d 224].) *People v. Barnett* (1998) 17 Cal.4th 1044 stated at page 1140 [74 Cal.Rptr.2d 121, 954 P.2d 384]: " 'The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence. . . . " 'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel . . . .' " ' (*People v. Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].)"

■ A criminal defense attorney should be on guard against the improper impeachment of his or her own witnesses. (*People v. Marquez* (1986) 188 Cal.App.3d 363, 368 [232 Cal.Rptr. 577].) The Attorney General suggests no tactical reason for defense counsel to withhold objection to evidence of mere arrests or misdemeanor conduct not involving moral turpitude, and we cannot imagine one.

Determining whether this lapse was prejudicial is not easy. In *People v. Bryden* (1998) 63 Cal.App.4th 159 [73 Cal.Rptr.2d 554], arrest evidence was determined not to be prejudicial when the defense attorney successfully objected and the witnesses were not "critical witnesses for the defense." (*Id.* at p. 184.) In contrast, the defense witnesses in this case who were improperly impeached were the only ones who presented a version of the incident which contradicted the prosecution's.

The Attorney General asserts that any error was not prejudicial because "[t]he other evidence of [defendant's] guilt was overwhelming." But, the "other evidence" was simply the testimony of the prosecution's percipient witnesses.

This case was a credibility contest between the witnesses for the prosecution and the defense. The jury was presented with sharply conflicting testimony. The prosecution witnesses, San Jose Police Officers David Seminatore, Michael Bui, and Gabriel Reyes, each described defendant as aggressively resisting their efforts to talk to him and to take him into custody. The four defense witnesses were not consistent about various details,[10] but they were consistent in saying that defendant did not use racial slurs, that Seminatore said provocative things to defendant, and that defendant did not struggle when the police manhandled him.

In this case, the jury did not take long to deliberate, just over two hours in two days. The jury obviously disbelieved the defense witnesses. The prosecutor urged them to do so in large part for improper reasons. In this case, this unhindered excess undermines our confidence in the outcome. We conclude that defendant's convictions must be reversed. As we explain below, even if we had doubt that this omission alone justifies reversal, defendant was prejudiced in another way.

B. *Invocation of right to counsel*

As we explain more fully below (see pt. 2.A., *post*), the jury was instructed that a person's failure to deny an accusation of a crime may be considered as an adoptive admission of guilt.

---

[10] For example, Chino said he saw no officer with a drawn gun, while his wife said that a female officer had her gun out and aimed it at everyone.

The prosecutor argued to the jury, "The defendant basically admitted the resisting, delaying, challenging the officer when he was interviewed by Officer Bui at the hospital.[11] Do you remember Officer Bui asked the defendant, 'Why did you resist?' [¶] A reasonable person at that time would offer their side of the story if they were not good for it, if they were not guilty. If they were guilty, if they were challenging the officer, if they were threatening the officer, they would continue doing that. And this defendant said to the officer, 'Fuck you.' That's how he responded when asked to explain his actions. That's an adoptive admission where he basically, in essence, admits that he resisted." The prosecutor did not fully quote Bui's testimony, which had defendant saying, " 'Fuck you. I want to talk to my lawyer.' "

On appeal defendant complains that his trial attorney should have objected to this testimony and this argument. The Attorney General asserts that this evidence was admissible as an adoptive admission.

█ It is established that a person's invocation of his or her right to remain silent cannot be used as evidence of guilt. Official advice pursuant to *Miranda* of a person's right to remain silent carries with it an implicit assurance that "silence will carry no penalty." (*Doyle v. Ohio* (1976) 426 U.S. 610, 618 [49 L.Ed.2d 91, 96 S.Ct. 2240].) *Doyle* held specifically that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Ibid.*, fn. omitted; cf. *People v. Givans* (1985) 166 Cal.App.3d 793, 798–800 [212 Cal.Rptr. 762].) *Doyle* stands for the more general principle that a person's silence in apparent reliance on *Miranda* advice cannot be used against him or her in a criminal trial. By extension, the prosecution also cannot use a person's refusal to answer questions or his or her invocation of the right to remain silent or the right to counsel. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 65 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman*) [the prosecutor asked whether the defendant had asked for a lawyer when the police talked to him]; *People v. Evans* (1994) 25 Cal.App.4th 358, 367–369 [31 Cal.Rptr.2d 20] [the prosecutor asked whether the defendant denied culpability when the defendant said he did not want to talk to the police]; *Fields v. Leapley* (8th Cir. 1994) 30 F.3d 986, 990 [the defendant stated, " 'I ain't saying nothing' " and " 'I won't talk to you about that

---

[11] Actually Bui testified that this conversation occurred later at the jail after defendant had initially waived his *Miranda* rights.

without an attorney' "]; *U.S. v. Szymaniak* (2d Cir. 1991) 934 F.2d 434, 436 [the defendant was vague and did not answer questions and stated: " ' "I'm in a lot of trouble and I want to speak to my lawyer" ' "].)

■ When an arrestee is advised of his right to remain silent and he exercises that right in response to an official accusation, the doctrine of adoptive admissions does not apply. (*People v. Jennings* (2003) 112 Cal.App.4th 459, 472–473 [5 Cal.Rptr.3d 243].)

Defendant argues that the express invocation of his right to counsel was not the only part of his statement that was inadmissible. He contends that in this context, "Fuck you" meant that he was now invoking his right to remain silent. The statements were inextricably intertwined. The Attorney General seeks to parse defendant's statement, noting that the prosecutor only argued that "Fuck you" was an adoptive admission.

■ *People v. Samayoa* (1997) 15 Cal.4th 795 [64 Cal.Rptr.2d 400, 938 P.2d 2] stated at page 829: "This court has observed 'that no particular form of words or conduct is necessary on the part of a suspect in order to invoke his or her right to remain silent' (*People v. Crittenden* [(1994)] 9 Cal.4th [83,] 129 [36 Cal.Rptr.2d 474, 885 P.2d 887]), and the suspect may invoke this right by any words or conduct reasonably inconsistent with a present willingness to discuss the case freely and completely (*ibid.*)." A person who initially waives his or her *Miranda* rights retains the right to cut off further police interrogation. (*People v. Hayes* (1985) 38 Cal.3d 780, 784 [214 Cal.Rptr. 652, 699 P.2d 1259].) "Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in the light of all the circumstances: 'A desire to halt the interrogation may be indicated in a variety of ways,' and the words used by the suspect 'must be construed in context.' " (*Id.* at pp. 784–785; see *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238 [74 Cal.Rptr.2d 212, 954 P.2d 475].)

■ Regarding the right to counsel, "Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 114 S.Ct. 2350].) "[W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." (*Id.* at p. 461.)

We recognize that, according to the prosecution evidence, defendant was liberally swearing throughout the evening. But this particular curse must be put in its context. It occurred after defendant had been given a *Miranda* admonition and immediately after the officer asked why defendant had resisted the officers. In this context, defendant's entire response must be considered together as a refusal to answer this question as well as an invocation of his right to counsel. We see nothing ambiguous or equivocal about this statement. (Cf. *People v. Michaels* (2002) 28 Cal.4th 486, 510–511 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) It does not appear to be a selective invocation of defendant's right to remain silent. (See *Coffman, supra,* 34 Cal.4th at pp. 119–120, and cases there cited.)

In this case, the jury should not have been asked to consider defendant's colorful invocation of his right to counsel as an adoptive admission. Defense counsel should have brought a motion in limine or, at least, if defense counsel had objected during trial, the trial court should have directed the jury to disregard this testimony. (Cf. *People v. Lucero* (2000) 23 Cal.4th 692, 718 [97 Cal.Rptr.2d 871, 3 P.3d 248].) Again, there is no suggested or apparent tactical reason for defense counsel's failure to object to this evidence and argument.

Had Officer Bui merely mentioned defendant's statement, it would be easier to determine that defendant was not prejudiced by it. (*Coffman, supra,* 34 Cal.4th at pp. 66–67.) However, it featured prominently in the prosecutor's jury argument as one of two adoptive admissions by defendant. To compound the prejudice, as we explain below (see pt. 2.A., *post*), the jury was inadequately instructed about admissions. In light of these two combined errors and the prejudicial admission of arrest evidence, we conclude that all defendant's convictions must be reversed.[12]

C. *Defendant's prior bad acts*

Defendant complains that the prosecutor went too far in impeaching the opinion of Chino's wife, Anna Vasquez, that defendant is "good people."

In cross-examination, the prosecutor established that Vasquez was unaware of defendant's criminal history, including serving time for domestic violence, a stabbing, and assault on a police officer. She said this would not change her opinion of him.

---

[12] In light of this conclusion, we will consider the remaining arguments only insofar as needed to provide guidance for further proceedings. We have no occasion to reach defendant's claim of sentencing error under *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531].

The jury was given a limiting instruction. (CALJIC No. 2.42.)[13] In argument, the prosecutor asserted "that a person whose opinion would not be changed after hearing such things is not a person who can be trusted."

██ When a witness testifies to a defendant's good reputation, the prosecutor is entitled to ask in good faith if the witness has heard of misconduct by the defendant. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1173 [64 Cal.Rptr.2d 892, 938 P.2d 950]; see *People v. Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) Defendant asserts that the prosecutor should have asked about what Vasquez had heard, not about what she knew. (*People v. Marsh* (1962) 58 Cal.2d 732, 745–746 [26 Cal.Rptr. 300, 376 P.2d 300], and cases there cited.)

██ We understand the rule invoked by defendant to be limited to reputation witnesses. When a witness offers an opinion of a defendant's good character, it is often based on personal knowledge as well as reputation. (*People v. Hurd* (1970) 5 Cal.App.3d 865, 880 [85 Cal.Rptr. 718].) This opens the door for the prosecutor to offer rebuttal evidence of defendant's character. (Evid. Code, § 1102, subd. (b).) Character evidence includes opinions, reputation, and specific instances of the person's conduct. (Evid. Code, § 1100.) The prosecutor can test the witness's opinion by asking about his or her knowledge of the defendant's misconduct (*People v. Clair* (1992) 2 Cal.4th 629, 682–683 [7 Cal.Rptr.2d 564, 828 P.2d 705]), even if the witness professes ignorance. (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 954 [196 Cal.Rptr. 412].)

## 2. INSTRUCTIONS

### A. *Admissions*

On appeal defendant contends that the trial court erred in incompletely instructing the jury about admissions.

---

[13] The jury was instructed: "A witness has been asked on cross-examination if he or she has heard of reports or incidents of certain conduct of the defendant inconsistent with the traits of good character to which the witness has testified. These questions and the witness'[s] answers to them may be considered only for the purpose of determining the weight to be given the opinion of the witness or to his or her testimony as to the good character of the defendant.

"These questions and answers are not evidence that the reports are true, and you must not assume from them that the defendant did, in fact, conduct himself inconsistently with those traits of character. [¶] . . . [¶]

"This evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show the strength or weaknesses of the witness'[s] opinion."

As indicated above, the prosecutor argued to the jury that defendant made two adoptive admissions. When Officer Seminatore told defendant about his neighbor's complaints, defendant did not deny them. Instead he said, "Fuck her. I don't give a fuck about her." When Officer Bui later asked defendant why he resisted arrest, defendant said, "Fuck you."

The jury was instructed in terms of CALJIC No. 2.71.5 that a jury may consider the following circumstances as "an admission [by the defendant] that the accusation was true": he was accused of the crime charged; he heard and understood the accusation; he had an opportunity to deny it; and he failed to do so. The jury was instructed to disregard any statement that it found did not amount to an admission.

However, "admission" was not defined in terms of CALJIC No. 2.71 as a statement by the defendant that tended to prove his guilt of the crime charged, nor was the jury instructed to view cautiously evidence of an oral admission (CALJIC Nos. 2.71, 2.71.7) and that an admission alone is not enough to convict a person (CALJIC No. 2.72).

█ The Attorney General asserts that defendant should have requested these instructions. However, an instruction like CALJIC No. 2.71 should be given sua sponte when, as here, there is evidence of a defendant's oral admission. (*People v. Beagle* (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]; *People v. Marks* (1988) 45 Cal.3d 1335, 1346 [248 Cal.Rptr. 874, 756 P.2d 260]; *People v. Carpenter* (1997) 15 Cal.4th 312, 392–393 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

█ The omission of cautionary instructions about admissions "does not constitute reversible error if upon a reweighing of the evidence it does not appear reasonably probable that a result more favorable to defendant would have been reached in the absence of the error." (*People v. Beagle, supra,* 6 Cal.3d at p. 455; see *People v. Stankewitz* (1990) 51 Cal.3d 72, 94 [270 Cal.Rptr. 817, 793 P.2d 23]; *People v. Carpenter, supra,* 15 Cal.4th at p. 393.) "Omission of CALJIC No. 2.72 is harmless where the corpus delicti is clearly established by evidence independent of the admissions." (*People v. Daly* (1992) 8 Cal.App.4th 47, 59 [10 Cal.Rptr.2d 21].) "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. (See *People v. Bunyard* (1988) 45 Cal.3d 1189, 1224 [249 Cal.Rptr. 71, 756 P.2d 795]; *People v.*

*Beagle*[, *supra*,] 6 Cal.3d 441, 456 [harmless error: one statement heard by two witnesses, one of whom was defendant's friend; other statement heard by police officer; no conflict in evidence]; *People v. Ford* (1964) 60 Cal.2d 772, 799–800 [36 Cal.Rptr. 620, 388 P.2d 892] [reversible error: witnesses reporting admission were hostile and inconsistent]; *People v. Blankenship* (1970) 7 Cal.App.3d 305, 311–313 [86 Cal.Rptr. 651] [harmless error: witness relating admissions was highly credible and admissions were corroborated]; *People v. Hunter* (1969) 1 Cal.App.3d 461, 465 [81 Cal.Rptr. 750] [police officer's testimony relating admissions was reliable and corroborated].)" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1268 [278 Cal.Rptr. 640, 805 P.2d 899].)

The Attorney General asserts that these instructional omissions were harmless because there was no dispute about what defendant said, there was ample other evidence of his crimes, and the jury was otherwise instructed about evaluating the credibility of a witness.

As stated above, defendant was prejudiced by the jury being allowed to consider his invocation of his right to silence as one of two adoptive admissions. This prejudice was compounded by the failure to give cautionary instructions about oral admissions.

### B. *Resisting an executive officer*

In count 2, defendant was charged with violating section 69,[14] which actually describes two related offenses, attempting to deter and actually resisting an officer. These two offenses have different elements. Unlike resisting, the attempt to deter does not require the officer to be performing his duties at the time of the crime. The attempt may be intended to deter the officer's future performance of duties. (*In re Manuel G.* (1997) 16 Cal.4th 805, 816–817 [66 Cal.Rptr.2d 701, 941 P.2d 880].) Also, this court has recognized that a willful attempt to deter or prevent involves a specific intent. (*People v. MacKenzie* (1995) 34 Cal.App.4th 1256, 1280 [40 Cal.Rptr.2d 793] (*MacKenzie*); cf. *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153–1154 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

Although the Use Note to CALJIC No. 7.50 does not clearly say so, that instruction purports to describe the elements of both related offenses. The

---

[14] Section 69 states: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment."

court in this case gave the jury most of this instruction,[15] but it omitted the elements of attempting to deter.[16]

Defendant justifiably complains that the trial court should have instructed the jury sua sponte about the elements of attempting to deter, particularly since the prosecutor relied on this theory.

The court instructed the jury in terms of CALJIC No. 4.20 that defendant's voluntary intoxication was not a defense to the crimes charged. Defense counsel said "yes," when asked if he wanted this instruction.

■■■ This court has previously determined that a defendant's intoxication might create a reasonable doubt that he had the specific intent to deter or prevent a police officer. (*MacKenzie, supra,* 34 Cal.App.4th at pp. 1280–1281.) Thus, CALJIC No. 4.20 is inapplicable to this type of the offense. (Cf. *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133 [77 Cal.Rptr.2d 428, 959 P.2d 735] [intoxication is relevant to aiding and abetting liability].)

We need not determine whether this error was invited. On retrial the jury should not be instructed that CALJIC No. 4.20 applies to an attempt to deter an officer.

---

[15] The jury in this case was instructed that defendant was charged in count 2 with violating section 69 because he "did attempt, by means of threats and violence, to deter and prevent an executive officer, David Seminatore from performing a duty imposed upon the officer by law and knowingly resist, by the use of force and violence, the executive officer in the performance of his duty."

The jury in this case was also instructed as follows in terms of CALJIC No. 7.50 with one omission. "[Defendant is accused [in count 2] of having violated section 69 of the Penal Code, a crime.]

"Every person who willfully [and unlawfully] attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon that officer by law, or who knowingly resists, by the use of force or violence, an executive officer in the performance of his or her duty, is guilty of a violation of Penal Code section 69, a crime.

"An 'executive officer' is a public employee whose lawful activities are in the exercise of a part of the sovereign power of the governmental entity employer, and whose duties are discretionary, in whole or in part. Any employee charged with the responsibility of enforcing the law is an executive officer.

"In order to prove this crime, each of the following elements must be proved:

"[1. A person knowingly [and unlawfully] resisted an executive officer in the performance of his or her duty; and

"2. The resistance was accomplished by means of force or violence,] or threat thereof."

"Or threat thereof" was added at the prosecutor's request.

[16] The jury was not told in terms of CALJIC 7.50: "1. A person willfully [and unlawfully] attempted to deter or prevent an executive officer from performing any duty imposed upon that officer by law; and [¶] 2. The attempt was accomplished by means of any threat or violence."

### C. *Lesser included offenses*

Defendant also asserts that the trial court should have instructed the jury about the lesser offenses included in a violation of section 69, namely sections 148 and 415.

Section 148, subdivision (a)(1), prohibits "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment." The trial court considered and rejected the idea of giving section 148 as a lesser included offense.

In this case, as the jury was instructed, defendant was charged with violating section 148 in count 4. To distinguish the crimes, the prosecutor told the jury in closing argument that the violation of section 148 "is essentially the same thing as the 69, Count 2, except without the force or violence. I'm just going to suggest to you that consider the 148 as though it were everything that happened after the arrest. Consider the 69 as though it was everything that happened before the arrest."

The jury was also instructed that defendant was charged with violating section 415 in count 1 by willfully and maliciously making a loud and unreasonable noise that disturbed another person.

 We agree with *People v. Belmares* (2003) 106 Cal.App.4th 19 [130 Cal.Rptr.2d 400] (*Belmares*) that section 148 is not a lesser included offense of section 69, because section 69 can involve a present attempt to deter an officer's future duty. (*Belmares, supra*, at pp. 24–26.) We see no conflict between *Belmares* and *People v. Esquibel* (1992) 3 Cal.App.4th 850 [5 Cal.Rptr.2d 47]. We understand *Esquibel* to have assumed without deciding that section 148 is a lesser included offense of section 69. (*Esquibel, supra*, at pp. 854–855.) In any event, to the extent there is a conflict in these opinions, this court has characterized section 148 as a lesser related offense. (*MacKenzie, supra*, 34 Cal.App.4th at pp. 1279–1280.) A criminal defendant has no right to requested instructions on lesser related offenses without the prosecutor's permission. (*People v. Birks* (1998) 19 Cal.4th 108, 112–113 [77 Cal.Rptr.2d 848, 960 P.2d 1073].)

Defendant contends that *Belmares* is distinguishable due to the difference in the pleadings in this case. Defendant contends that the violation of section 69 was alleged in the conjunctive (as quoted in fn. 15, *ante*), thereby limiting proof to resisting an officer in the present performance of his duty, which would also violate section 148.

 Defendant misunderstands the significance of these allegations. When a crime can be committed in more than one way, it is standard practice

to allege in the conjunctive that it was committed every way. Such allegations do not require the prosecutor to prove that the defendant committed the crime in more than one way. (*In re Bushman* (1970) 1 Cal.3d 767, 775 [83 Cal.Rptr. 375, 463 P.2d 727], disapproved on other grounds by *People v. Lent* (1975) 15 Cal.3d 481, 486, fn. 1 [124 Cal.Rptr. 905, 541 P.2d 545].) We read the information to have charged defendant with violating section 69 in the statute's terms. "When . . . the accusatory pleading describes a crime in the statutory language, an offense is necessarily included in the greater offense when the greater offense cannot be committed without necessarily committing the lesser offense." (*People v. Marshall* (1997) 15 Cal.4th 1, 38 [61 Cal.Rptr.2d 84, 931 P.2d 262]; see *People v. Wolcott* (1983) 34 Cal.3d 92, 99 [192 Cal.Rptr. 748, 665 P.2d 520].) The statutory elements test is the only one relevant here. The trial court need not have instructed the jury that either section 148 or section 415 was an offense included in section 69.

### D. *Resisting arrest*

On appeal, defendant contends that the trial court erred by neither naming a victim of the section 148 charge nor giving a unanimity instruction like CALJIC No. 17.01. He argues when "some jurors could base their conclusions on defendant's conduct towards one officer with other jurors reaching their conclusion with reference to defendant's conduct in resisting a different officer," then either the prosecutor must elect the section 148 victim or the jury should be given a unanimity instruction. (*People v. White* (1980) 101 Cal.App.3d 161, 169, fn. 3 [161 Cal.Rptr. 541].) A unanimity instruction should be given sua sponte when appropriate. (*People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1071 [64 Cal.Rptr.2d 395]; see *People v. Riel* (2000) 22 Cal.4th 1153, 1199 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

The evidence was that when Officer Bui told defendant to turn and put his arms behind his back because he was under arrest, defendant did not comply. He struggled when Officers Bui and Seminatore grabbed his arms. He struggled when several officers, including Bui and Seminatore, took him to the ground. When he got up, other officers, including Johnson and Beiderman, took him to the ground again. Later, defendant pushed away from the patrol car when Officer Reyes tried to push him inside.

As noted above, the prosecutor asked the jury to consider that the section 148 violation "was everything that happened after the arrest." The section 69 violation occurred before the other officers arrived.

■ When two offenses are so closely connected in time that they form part of one transaction, no unanimity instruction is required. (See *People v. Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971].)

Similarly, when a prosecutor elects to rely on multiple acts in a continuous course of conduct as one crime, no unanimity instruction is required. (*People v. Dominick* (1986) 182 Cal.App.3d 1174, 1208 [227 Cal.Rptr. 849] [murder involved one or both defendants striking victim with pole, one defendant snapping his head around, and both defendants pushing him over a cliff in a car]; *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1296 [72 Cal.Rptr.2d 143] [two encounters minutes apart amounted to one robbery]; *People v. Turner* (1983) 145 Cal.App.3d 658, 681 [193 Cal.Rptr. 614] ["the prosecutor without objection argued the taking of the money, gold chains and the car constituted a single robbery"], disapproved on other grounds by *People v. Majors* (1998) 18 Cal.4th 385, 411 [75 Cal.Rptr.2d 684, 956 P.2d 1137] and by *People v. Newman* (1999) 21 Cal.4th 413, 422, fn. 6 [87 Cal.Rptr.2d 474, 981 P.2d 98]; see *People v. Harris* (1994) 9 Cal.4th 407, 431, fn. 14 [37 Cal.Rptr.2d 200, 886 P.2d 1193] [four takings supported single robbery count].)

The prosecutor's election to consider "everything" that defendant did after the initial attempt to arrest him as the section 148 violation meant that every officer whom defendant resisted was a victim of this charge. There was no evidentiary basis for the jury to conclude, for example, that defendant resisted Officer Bui, but not Officers Beiderman and Johnson. (*People v. Riel, supra,* 22 Cal.4th at p. 1199.) Under these circumstances, we conclude that no unanimity instruction was required.[17]

### E. *Lawfulness of arrest*

The jury was appropriately instructed that an element of the charges of violating sections 69, 148, and 415 was that the peace officer was engaged in the performance of his or her duties and that those duties do not include employing excessive force to make an arrest. (CALJIC No. 9.29; *In re Manuel G., supra,* 16 Cal.4th 805, 815.) The jury was further instructed that an arrest can involve the actual restraint of a person (CALJIC No. 9.25), and that a person being arrested should not forcibly resist unless the officer employs excessive force and that an officer can employ reasonable force to overcome resistance. (CALJIC No. 9.26.)

If defendant wants further instructions on retrial about an arrestee's justification in using reasonable force to protect himself against excessive force in terms of CALJIC Nos. 9.28 and 5.30, he may request them. It does not appear to us that the trial court was required to give them sua sponte, particularly considering that the defense argument was simply that the officers employed excessive force against a passive defendant.

---

[17] In light of this conclusion, we need not consider which standard of prejudice applies.

Defendant also contends that the jury should have been asked to determine whether the police unlawfully invaded the curtilage of his residence to arrest him. (*People v. Wilkins* (1993) 14 Cal.App.4th 761, 779 [17 Cal.Rptr.2d 743].) Such an instruction may be appropriate on retrial if there is evidence, not yet apparent, that an officer unlawfully invaded the curtilage of defendant's residence. (Cf. *People v. Zichwic* (2001) 94 Cal.App.4th 944, 953–954 [114 Cal.Rptr.2d 733].)

### F. *Defendant's right to rely on the evidence*

The jury was instructed in terms of CALJIC No. 2.60: "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that a defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way."

The jury was not instructed in terms of CALJIC No. 2.61, which states: "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against [him] [her]. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against [him] [her] on any essential element."

Instead, the judge added the following second sentence to CALJIC No. 2.60 as quoted above. "No lack of testimony on the defendant's part will relieve the People of their burden of proving every essential element of the crimes charged beyond a reasonable doubt." Defense counsel agreed to this combination of these instructions.

On appeal defendant contends that the trial court erred in failing to instruct the jury about a defendant's right, in choosing not to testify, to rely on the state of the evidence.

 A defendant is entitled to have both instructions given on request. (*People v. Evans* (1998) 62 Cal.App.4th 186, 190–191 [72 Cal.Rptr.2d 543].) However, neither instruction is required to be given sua sponte, as a defendant might not want the court to draw attention to his or her failure to testify. (*People v. Gardner* (1969) 71 Cal.2d 843, 852–854 [79 Cal.Rptr. 743, 457 P.2d 575]; *People v. Preston* (1973) 9 Cal.3d 308, 316–317 [107 Cal.Rptr. 300, 508 P.2d 300]; see *People v. Holt* (1997) 15 Cal.4th 619, 687 [63 Cal.Rptr.2d 782, 937 P.2d 213].) *People v. Townsend* (1971) 20 Cal.App.3d 919 [98 Cal.Rptr. 8] held that a court should give CALJIC No. 2.60 if it gives CALJIC No. 2.61. (*Id.* at pp. 924–925.) Contrary to

defendant's characterization, *Townsend* does not hold that 2.61 must be given if 2.60 is given. Indeed, the court suggests that 2.61 need not be given sua sponte when 2.60 is given. (*Townsend, supra*, 20 Cal.App.3d at p. 924, fn. 7.)

Since defendant did not request that CALJIC No. 2.61 be given in its entirety, we conclude that he cannot complain on appeal that only part of it was given.

### 3. Discovery of Evidence Against Police Officers

In advance of trial defendant filed a motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] asking to discover any complaints about Officers Cooke, Reyes, Seminatore, Smith, Johnson, Bui, Beiderman, and Sergeant Pate. On July 21, 2003, a judge reviewed in camera the files of these officers and determined that they contained no discoverable complaints. Defendant, who has no access to this sealed transcript, asks us to review it. Having done so, we find no abuse of discretion. (*People v. Hughes* (2002) 27 Cal.4th 287, 330 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Mooc* (2001) 26 Cal.4th 1216, 1232 [114 Cal.Rptr.2d 482, 36 P.3d 21].)

### 4. Attorney Fee Order

The probation report in this case recommended that defendant be ordered to pay $1,000 in attorney fees if appropriate.

In support of defendant's motion to strike his prior strike conviction, defendant submitted a letter to the court stating in part, "I have [es]tablished over $16,000 worth of credit, bought a new 2001 Silverado, a 95 Civic, paid $4,000 of $8,000 to buy a pressure washing business from my brother in Arizona." Defense counsel mentioned defendant's business plans.

At sentencing the court ordered defendant to pay attorney fees "not to exceed $1,000."[18] The abstract of judgment reflects an order to pay $1,000.

Defendant did not object at the time, but on appeal he contends that the court had no evidence supporting the implied finding of his ability to pay or overcoming the presumption that defendant, who has been sentenced to

---

[18] The conditional nature of this order suggests that some other determination is to take place before an amount is finally determined. The statute does provide: "The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided." (§ 987.8, subd. (b).) But we see no such order in the record.

prison, is unable to pay his public defender. The Attorney General asserts that this challenge has been waived and that there was evidence supporting the order.

In the absence of a guilty plea, the sufficiency of the evidence to support a finding is an objection that can be made for the first time on appeal. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262 [70 Cal.Rptr.2d 334, 949 P.2d 31]; *People v. Jones* (1988) 203 Cal.App.3d 456, 461 [249 Cal.Rptr. 840], disapproved on another ground by *People v. Tenner* (1993) 6 Cal.4th 559, 566, fn. 2 [24 Cal.Rptr.2d 840, 862 P.2d 840].)

Section 987.8 authorizes the court to order criminal defendants to pay all or part of the cost of their appointed counsel after the trial court determines the defendant has a present ability to pay.[19] The ability to pay includes the defendant's reasonably discernible future financial position, limited to the next six months. (§ 987.8, subd. (g)(2)(B).)

While this statute ordinarily may not require an express finding of ability to pay (cf. *People v. Phillips* (1994) 25 Cal.App.4th 62, 76 [30 Cal.Rptr.2d 321]), it contains a presumption that those sentenced to prison are unable to pay."Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense." (§ 987.8, subd. (g)(2)(B).) We construe this part of the statute to require an express finding of unusual circumstances before ordering a state prisoner to reimburse his or her attorney.

Since we are reversing defendant's convictions, the trial court will have an opportunity to reconsider this attorney fee award in light of our observations.

---

[19] Section 987.8, subdivision (f) provides in part: "Prior to the furnishing of counsel or legal assistance by the court, the court shall give notice to the defendant that the court may, after a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost of counsel. The court shall also give notice that, if the court determines that the defendant has the present ability, the court shall order him or her to pay all or a part of the cost." "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, . . . the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof." (§ 987.8, subd. (b).) "If the court determines that the defendant has the present ability to pay all or a part of the cost, the court shall set the amount to be reimbursed and order the defendant to pay the sum to the county." (§ 987.8, subd. (e).) At an ability to pay hearing, the court shall consider a defendant's present financial position. (§ 987.8, subd. (g)(2)(A).)

### DISPOSITION

The judgment is reversed.

Rushing, P. J., and Premo, J., concurred.